May it please the Court, Christine Cesar with the law firm of Bryan Cave on behalf of the appellant. With the Court's permission, I would like to request to reserve three minutes for rebuttal. That's fine. You've got an uphill battle here. All right. I mean, you've got an extremely detailed opinion of a well-respected bankruptcy judge who said, I didn't understand what was going on. If I didn't understand what was going on, for sure the bondholders didn't understand what was going on. And it was buried, and that's not the way we do business here in my court. I understand, Your Honor, and I would like to address that straight out. There was no intention to hide anything from the bankruptcy court, and the record shows that nothing, in fact, was hidden from the bankruptcy court. As a preliminary matter, the release in favor of the indenture trustee was the only thing in the settlement which the indenture trustee was going to obtain, and it was our objective that it be fully vetted and enforced, and we took a two-step process to do that. The first was the 9019 motion because we wanted to preview the release both for the bankruptcy court and the bondholders. But I've got the judge concerned is that you have in that 9019 motion a hearing on that. He's asking, you know, what's the involvement of the trustee here? And he keeps asking, and he said, you're binding the bondholders to that. It affects the debtor in the bankruptcy estate that I oversee. If that's true, you've got to deal with your constituency. Why is the bankruptcy court involved in that? And then Mr. Schell said, well, that's because the releases that are a part of this are there. It's a global settlement, so the claims, what our position is, is that the claims against the bond trustee are claims that would be made over against the debtors and would deplete the estate, and, in effect, there would be a third-party action. And that's not the right answer. Well, Your Honor, respectfully, prior to that, in addition to the papers that were submitted to the court, the 9019 motion was 17 pages. There were two pages that highlighted what were called critical terms. Paragraph 23G of 33 paragraphs is the only paragraph that mentions exactly what's happening here. You're technically correct. You did tell the court, but what the court is saying is for something of this nature, you've got to highlight it and you've got to be honest or direct. I won't say dishonest because I'm not saying anyone is dishonest, but you have to be direct in telling the court why it is that you're putting this in there. Your Honor, in addition to the 9019 motion, which in the record it's at 1040 where these specific terms are highlighted, that was the first thing that the bankruptcy court saw. And the court indicated to counsel that he had read the motion. And, in fact, before the hearing, he contacted debtors' counsel, his clerk did, and said, the judge has the papers. He has questions about three paragraphs in the proposed order. The proposed order was three pages, the last paragraph of which related to these releases. And the judge asked counsel to address three specific paragraphs. The paragraph relating to the release was not one of them. And when we got into court, it was reasonable to assume based on that direction prior to the hearing and then it was confirmed during the hearing, it's in the transcript, that the court said I have questions about three specific paragraphs that I would like answered. And, again, confirming that he had read the motion. Now, in answer to a different question that he asked, Mr. Schell did say, Your Honor, we're talking about a global settlement and releases. And because claims made against the trustee would be made over and against the debtor, these are all transactionally bound together, and we're settling those. How would the claims be made against the debtor? I'm sorry? How would that work? Would there be a third-party action by the trustee against the debtor? If somebody claimed – I mean, look, there was a $26 million secured obligation that was reduced down to $8.15 million. Is that correct? Correct. And so you've already given up close to $18 million, and you're saying the reason – the bondholders are upset, obviously. Becker filed an objection. If you want the bondholders to vote on the plan, and that's who's actually going to do the voting, then you really have to make sure that they understand what they're voting on. And you're saying, in effect, well, the bankruptcy judge knew, but he's not the bondholder. And also, before confirmation, it came to light what was going on, or at least it came to his awareness. And prior to the confirmation, he said, I'm not going to go along with this. And you still went forward with confirmation. Your Honor, let me also add, with respect to the 9019 motion. That's the one in September of 2011. Correct. That was the first motion. As I said, two things we were trying to accomplish there. One was to put the bondholders on notice of the settlement, which included the monetary terms and the releases, and to preview it for the court, because under the settlement stipulation, if the release was not going to be included in the settlement, then it was all undone. Everyone went back to the status quo ante. That is why it was in our interest, and, in fact, we wanted to know. But that isn't what happened. I mean, you went through with the confirmation hearing, right? Yes, but, Your Honor, so in the hearing, we answered Judge Frank's questions. We believe he's satisfied. He signs the proposed order as is. He doesn't change it whatsoever. More than two months later, or maybe two months and a day, he enters an order sua sponte, and that order excises the release. We make a motion for reconsideration of that order. But he has a hearing. I'm sorry? He has a hearing, doesn't he? Well, he doesn't on that. In fact, what happens is he tells us to brief the motion for reconsideration on that order. But you get confirmation initially postponed. And then, together, he puts the return date. You agree to a separate hearing on the release. We ultimately agree to that. But the way it was set up originally, Your Honor, is that the motion for reconsideration of the sua sponte order, which excised the release, was made returnable the same day as the confirmation hearing. It was our understanding that the release issue was going to, in essence, be dealt with first. When we walked into the courtroom, we really did not know exactly what was going to happen. When we got there. That sounds like most confirmation hearings. I'm sorry? That sounds like most. Correct. That would be a fair assessment. But what happens when we get there, it becomes apparent that what's going to happen, the solution here is going to be this bifurcation order. And it was not a perfect solution. There's no question about that. But at that point, if this is crucial to you in agreeing to this plan, then you say we can no longer agree to this plan today. I mean, if it's crucial to you, that's what you do. So it obviously wasn't crucial to you. No, Your Honor, it was crucial to us. And that's exactly why we filed the 9019 motion back in September. Because at that point. No, but I'm talking about now. The judge says, he says, this is not part of this plan. I'm not approving it. We'll deal with it separately. And you don't say, well, then the global settlement has a glitch and we can't go through with it. Well, we don't do that, Your Honor, because of the following. At that point, if we had pulled out of the plan, everything would have fallen apart. And the hospital, there was almost a certainty that this plan of reorganization would have cratered on the spot. The holders, we had worked with the holders. We had worked with a near majority of the holders for 18 months, along with an independent financial consultant to come up with this package. They would have ended up getting nothing. There were these holders that gave up their claim against you for not refiling those UCC forms on time. The period for filing went by. And who were these holders who gave up that pretty good claim? Looks like a pretty good claim. I don't know if it's an actually good claim, but it looks like a pretty good claim. And they gave it up. And who were they? Well, no one objected, Your Honor. Was it the president of the hospital? I mean, who were these people who were giving up all these claims? Well, let me address the UCC filing issue. Which is a separate issue on the merits of that. Let me tell you this. It seems to me that that's a separate issue, and the bondholders who are going to give up their claim need to know what kind of claim they have and an assessment of whether it's a pretty good claim or it's a really short claim. Don't they have to know that about the claim against you before they consent to this thing? But that is, frankly, that is on them in this sense. We give them the information. The bondholder notices that went to the holders throughout the course of this bankruptcy had specific information about the claims that had been asserted. And that leads to one of the key points of Judge Frank. If this was you giving them information and it was so crucial to you, he noted at least five places in the disclosure statement where you could have put something and you didn't. And, for example, the provision called the bond trustee litigation. Why wasn't it in there? I mean, that was on page, on what, 40? The disclosure statement was what, 55 out of 62 or something? It was buried. Your Honor, again, if you were to take. Just take that one section. The bond trustee litigation. That, Christ, that you tell the person who's reading that what's going on and how you resolved it, how you settled it. Well, I think, in fact, that's what it did in the disclosure statement. It outlined the claims and defenses. I'm talking about that section, the bond trustee litigation. Why was it not in there? Some evaluation or assessment. As part of the settlement, the bondholders are giving a release to the indenture trustee. It was set out in a separate paragraph entirely where it discussed the releases, and it was very clear under this section. But even there, Judge Frank noted that, you know, you could have complied with Rule 3016 and you could have put it conspicuously, and you didn't do it. I think, Your Honor, that the second sentence was given no deference. The second sentence said very clearly that the holders are relinquishing their rights to any and all claims against the bond trustee. The point is, if it's a crucial point and you want to be sure that when you're done, you walk out of court, it's over. And the impression given, I think, to the bankruptcy court and to the district court, Judge Savage, is that, you know, you were trying to walk a fine line. Can we just get this through quietly? And what the court is saying is when it's something as crucial as you say, it can't be done quietly. They have to know exactly what's happening, what they're voting on. Your Honor, our set forth in our briefs, and I'm happy to walk through it. I notice that my time is up. I'm happy to stay here. Your Honor, our time. Okay. If you look at the body of information that was provided to these holders, beginning with the 9019 motion, continuing with the disclosure statement, and then within the plan, the release was prominently and clearly set forth. We wanted an answer. The release was set forth, but why not make it conspicuous? You know, you can use belt and suspenders and then you're covered. You're good. Well, here's one practical issue. I mean, are you talking about having this in terms of being in italics or bolding? Are you talking about that? 3016 talks about making it conspicuous in some way. Now, again, that relates to an injunction, but this is the equivalent of injunction because you're saying, folks, you ain't going to be able to sue us. Correct. Your Honor, it was in the paragraph relating to the release. I mean, we could debate probably all day different places that you could put references to releases. The disclosure statement cross-references. When it discusses the litigation and it discusses the settlement, it cross-references back to the settlement stipulation, which has in it all the information about the release, and it also has the release is clearly set forth within the disclosure statement. And it is very clear in that second sentence, which was given no weight by either court, that there's going to be a release. The bondholders are going to give a release to the bond trustee. And all of this, one of the things I had intended to start with, of course, before the questions is putting this release in context because why it was necessary and why it was important to us because if we didn't get the release, our remedy, which we were prepared to do, was go back to the litigation, the trustee litigation, and defend that and exonerate ourselves. What's the status of the class action or the action against the bank? The class action right now is we have opposed the motion for a class certification. There are some issues that have come out of that, and Judge Davis has asked me to do some additional discovery, do some supplemental discovery on some class action-related issues, and we're in the process of doing that. In addition, I can note, and you can take judicial notice of the fact, that no other bondholder has sought to join Mr. Becker as a co-plaintiff. We have, and by the way, in all of these proceedings, all of these proceedings, Mr. Becker has not put in any evidence. He has never submitted an affidavit. He has never submitted a declaration. The status right now is you're refining the definition of the class as to whether there will be a class? Correct. But I'm referring back to the proceedings in the bankruptcy court. There was never any evidentiary showing by Mr. Becker that he was confused, that he didn't understand it. In fact, the evidence is to the contrary, because he filed a motion for reconsideration on the release issue at the outset and then withdrew it. And then he filed an objection to the plan, and his claims that are set forth in the class action mirror the claims that were asserted against the trustee in the bankruptcy. I want to ask just a couple of factual questions. Was the $8 million distributed to the indenture trustee? Was it distributed to? To the indenture trustee. Correct. Is the indenture trustee holding it? There is, we have a charging lien on the way the indenture works. I don't think we have a charging lien. Yes, we have a charging lien on the funds, yes. You're holding them? On the distribution, yes. Okay. Okay, and the other thing is, can I go back to my question? You said that there was a group of bondholders who participated in the settlement and they were all happy with it. And I asked, who were they? Were they institutional bondholders? Were they people who were involved, insiders in the hospital? Do you know who they were? No, they were not insiders at the hospital. They were following the bankruptcy proceeding, we invited all bondholders to participate in this process. And a group came forward. Yes, you worked with a group. Right, and a group came forward. Two would be considered institutional holders, one was an individual. Okay. How many bondholders were there in total at the time of the vote on the plan? Well, we don't actually know that, Your Honor, in this sense. We have holders of record. Most investments are held through DTC. So we have, while we may have some individual holders that we're aware of. It's for the Reckoness Depository Trust. Yeah. The DTC holds on behalf of institutions who hold on, on behalf of other institutions who hold on behalf of other individuals. So the total amount, I don't actually know. What I can tell you is that of the voting, 90, I think it was 95 holders voted. Ninety of the 95 approved. Right, and 90 approved. Out of, Mr. Becker would say hundreds. Well, we don't know that, Your Honor. And as I'm sure this Court knows, the fact that you have people who do not respond, it's very clear that they cannot be considered as rejectors. The non-voters do not get that status. Otherwise, the bankruptcy court would be. Of course, the question, and we'll go full circle, why didn't they respond? I mean, maybe they didn't understand what was going on. Maybe it wasn't clear enough. Well, I think we need, but to make that finding, I think that you need evidence in the record of confusion or misunderstanding. We have the judges on that. But you have evidence in the record of the bankruptcy judge saying that he was confused and didn't understand. And he was disturbed. He used the word disturbed, too. I understand that. I think that, again. Because there was a key point at the 1990 hearing where something could have been said to him and the chance was just missed. Well, it was not missed because we thought that he didn't understand and we wanted to mislead him. That is certain. We wanted this issue teed up. The point, I guess, is what he said at the beginning of the opinion. This is a cautionary tale. What he was looking for is we have, in a tough situation, reached a settlement. The settlement, we take the $26 million and we reduce it down to a secure lien of $8.15. What the indentured trustee gets is a release from the bondholders for doing that. And that's been for this X, Y, and Z reasons. We're here today to ask your approval of this particular 1919 motion. It's all talk. And I read you some language. The Court gives a lot of additional language. Every time Mr. Schell walked up to the line, he sort of backed away. And you can see why, especially people on my right and left here were trial judges in Judge Berry's case and in Judge Rastani's case. You don't want that. You don't want that happening. You want people to let you know exactly what you're so that later on this judge, for him to come back and say, you know what, I was inadvertent. He used the word inadvertence at one point. And I wasn't aware. That takes a lot of guts for him to do that because it could have been done much easier and everybody could have been saved a whole lot of angst. Your Honor, understood. And as I said, in the context of being there, having known ahead of time that the judge had questions about three paragraphs and said, I am going to, I am prepared to approve the order in all other respects. That is what was in the record. And he said that that day. It was reasonable to assume that he understood the release paragraphs and that they were integral to the settlement. It was reasonable to assume, presume, not assume, but presume that he would be given all of the facts at the hearing and not just paragraphs 23G of the 33-paragraph motion. How come you don't have to tell the bondholders this? Look, here's your choice. Be a general unsecured creditor and who knows what you're going to get. Or take the eight million, or take the, who knows what you're going to get there. And you have a lawsuit against us of who knows what happens, but these are the claims in that lawsuit. Or get your eight million now. I mean, isn't that what you're supposed to tell the bondholders? That's the deal? It's actually a little more complicated than that, Your Honor, because the, you have the monetary recovery, right, that is negotiated, which is being funded by a whole separate bond issue. That's otherwise, they were looking at liquidation. The hospital was an extremist. It could not afford to pay the bondholders anything. The challenge had been the debtor sues saying the debt is unsecured. We actually get that on the right track. It's a secure, it's now considered a secure debt. They get paid 35% of what they're owed. As part of that settlement, the debtor has to now dismiss that lawsuit in which the debtor is challenging the class of its creditors and trying to move some creditors into a different class. That lawsuit has to go away. In addition to that, the debtor needs to have, needs to be released from its claims of indentification that it owes to the indenture trustee. And in this case, that's extremely, we're not talking about something abstract here. The Bank of New York is sued saying these liens are, we have a perfection problem with these liens. It's the hospital that didn't tell us that it changed its name, and they are trying to blame us in essence for that issue and that lapse. Unfortunately, I was part of the looking at when the code was being changed, Article 9, and I said to somebody, this is going to cause a major problem. And because the way I think it used to be was you could be, if you were substantially close, and now it had to be identical. It had to be just right. But that's on the trustee. I mean, having represented a trustee, a woman to trust for years, that's on the trustee. Your Honor, respectfully, we would disagree under our documents that this was our duty to uncover a name change that the debtor did. It was probably their duty to tell you, and they didn't do it. Correct. Correct. I understand that having, but in the end, that's what the next suit is about. That may not relieve you of your liability to the bondholders. You know, I don't know the answer to that, but there was a suit that says you're liable to bondholders, you know, because we could have had a secured claim for, what, 15 million, and we don't. But the reality is they can have a claim for even more than that. The reality is what can the hospital pay? I mean, that was the bottom line. The question is, what can the bank pay? That's what. Well, Your Honor, but we are not responsible. We did not put them into bankruptcy, and we are not responsible. But their suit is going to say we would have been in a better position in bankruptcy had you done what you're supposed to do, and we have a suit against you. That's what they're saying. I don't know who's going to win that suit, but you have to tell them there's that suit so they can go assess it and tell them what the claims are in the suit. Well, there are two things here that I really do need to, and I know you've been very generous, but I do want to bring this full circle. The indentification claim, if I can finish this piece of it, the indenture trustee has the right to be indentified by the debtor. The debtor cannot get out of bankruptcy unless that claim is released. In a situation like this where the debtor is claiming that it changed its name, it did not inform the bank of the name change, and now it's trying to use that as an excuse to declare the debt as unsecured. It gets released from, it settles up with the bondholders, correct? And it's going to get a release from the bank because it has to get out of bankruptcy, and it's getting a release from the holders. To fill that in, the bank has to get the release from the holders because we have the right, we have the right to now, assuming, for to get the bankruptcy for a moment, if this were all happening outside of the bankruptcy, we would have the right to be indentified by the debtor given these set of facts. And now we're giving that up because the debtor has to be removed from, get out of bankruptcy. We're giving that up. I don't understand how you read those indemnification provisions. I must say I don't read them the same. I think there's an issue there as to who ends up with the money at the end. If you don't tell anybody what's happening, how can they assess? Well, I don't think there's a – The situation is who ends up with the money at the end. How can they assess how to vote? I'm sorry, Your Honor? How can they assess how to vote? How can they – How to vote with respect to the plan. Well, I don't think there's anything in the bankruptcy law or the code that requires the indentured trustee to lay out what the claims may be against it. That's why – All we're talking about here is the release that you're getting as part of the settlement. They have to know what they're releasing. And the background of the litigation, the trustee litigation, what the claims and defenses were, what the debtor said about the claims and defenses, all of that was in the disclosure statement. They had access to the bankruptcy file. They are told in the notices to absolutely contact and seek advice from the accountants and lawyers, and that's, in fact, what Mr. Becker did. This is – there's nothing in the code that would suggest or require the indentured trustee in this circumstance. I've not seen it in any other place where someone being released, getting the benefit of a release is going to outline what the claims might be against it and what the value of those claims might be, which is what exactly – You are the indentured trustee, and these are the bondholders. Correct. And, you know, you may not have, quote, a fiduciary duty, but when you're dealing with your claims vis-a-vis the people who are being released, I mean, you have some obligation to let them know what's being released. I can't believe that that duty does not exist. I mean, maybe there's no Third Circuit law on it, but I think there's Second Circuit law on it. When you're dealing with not outsiders, but the very people you're holding the bonds for, you have a different relationship. You're saying to these people, you're not going to sue me, and I think you've got to say that very clearly. Your Honor, again, respectfully, if you look at the indenture, there's nothing in the indenture which is the operative document for us, and there's nothing in it that would require us to disclose what claims may break us. In fact, Judge Frank actually – There's always a duty of good faith. I'm sorry? There's always a duty of good faith. Well, Your Honor, we've not – there has not been another occasion. I've worked with indentured trustees for 30 years. I've not seen a situation where an indentured trustee has been required to set forth a roadmap to explain what the claims and defenses would be and what the value of those claims might be. That is, the bondholders have the information. They can seek independent counsel and make that decision. The bondholder is not an advisor. The bondholder simply acts pursuant to contractual duties, and it has absolutely no obligation to do – You don't mean the bondholder. You mean the indentured trustee. I'm sorry. Yes, I misspoke. What we've done, we've given you over $25 million. I know. So what we'll do is I would suggest that unless we ask a question of Mr. Barnes that you would like to deal with, I don't necessarily see the need for rebuttal. But if there's something that he says that you think needs to be rebutted, then we'll get you back on rebuttal. All right. Thank you, Your Honor. Okay. Mr. Barnes? Thank you, Your Honor. Alex Barnes from the law firm of Obermeyer, Redmond, Maxwell, and Hipple. I have one question for you. Okay. Mr. Becker filed an objection to the 1999 hearing, and then the matter, the order was entered granting the motion, the 1999 motion. There was, I guess, a motion for reconsideration. Is that right?  What did he do? Mr. Becker became aware of the situation regarding these purported releases after the 1919 motion was entered. So he did not file an objection to the 1919 motion? He wasn't aware of the 1919 motion and the purported releases. So then he filed in late September of 2011 what? He filed a motion for reconsideration of the approval of the 1919 motion. That's what I said. Okay. I had the predicate wrong. He withdrew it on October 21st? Yes. Okay. Why so? Because he was concerned about the inclusion in the settlement order, or the perception possibly that there could be a third-party release contained. That's why he filed the objection, right? He withdrew it on the understanding that he could raise it later. Correct. Because the debtors approached him and they were concerned that the motion to reconsider would possibly overturn the settlement, and it was a concern that that might have a negative impact on the reorganization. So with assurances that he would preserve his ability to object to the propriety of the inclusion of the third-party releases at the time of confirmation, he withdrew that motion for reconsideration. And then what did he do at the time of the disclosure statement hearing and at the confirmation hearing? Did he object to the plan? He did object to the plan. And, unfortunately, the motion to reconsideration was withdrawn prior to Judge Frank being able to review it. And had he reviewed it, he would have seen the objection that, in part, was based on the impermissible inclusion of the third-party release, and that would have highlighted that critical issue for him and obviously would have raised a host of concerns about the inadequate level of disclosure that had happened so far in connection, first, with the 1919 motion, and then, as Your Honor had commented, the colloquy that he had at the hearing, where he raised certain questions about why are there – We've been through that. Yes. Okay. Is there anything you want to say? The points that Your Honor had made, I think, amplify and echo what we have raised in brief. So if the Court doesn't have any further questions for me, that will be it. Thank you very much, Your Honor. Anything you want to respond to in connection with the Becker matter? Just that. Just one brief thing. The motion for reconsideration, just so it's clear from the record, that was filed after the 1919 – That was September 29th. Correct. And we did not have an – I think the approval was on September 14th of the order, right? Correct. And it was filed right thereafter. The circumstances surrounding that withdrawal of the motion for reconsideration is what Judge Davis has asked us to look further into. We were not given an opportunity to respond to that motion and deal with the issue at that time. It was withdrawn and then the objection preserved without any involvement from the indenture trustee. We objected to that because we wanted to deal with it at that point. I just want to make – Well, I mean, sometimes life's unfair. Well, to draw the motion, there are very few judges who want to leap to a motion if it's been withdrawn. I speak only for myself. Usually you just go phew. No, I'm not suggesting that the Court should have – I'm not suggesting that the Court should have done anything. I just want to make clear procedurally what happened, that we did not have an opportunity at that point. That was the point at which, frankly, to deal with this issue on the release. And we did not have an opportunity to do that. We did not agree that it had been – that issue had been preserved for later objection. Thank you, Your Honor. Thank you very much. Thank you to counsel. Some tough questionings, and you handled them as well as possibly you could. I take the matter under advisement and call our third case of this morning, Cox v. Horn et al., number 13-2982, Mr. Lev and Ms. Lorber.